UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ROBIN HASTE, On Behalf of<br>P.M.B., a Minor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0886-DFH-JMS |
| | ) | |
| MICHAEL J. ASTRUE,<br>Commissioner of the Social Security<br>Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON JUDICIAL REVIEW

Plaintiff Robin Haste seeks judicial review of the decision by the Commissioner of Social Security to deny supplemental security income to her daughter (referred to in this decision as "PMB"). PMB has suffered a number of serious impairments after being struck and nearly killed by two police motorcycles when she was eleven years old. The administrative law judge (ALJ) who decided for the Commissioner concluded that PMB's impairments did not meet, medically equal, or functionally equal any listed impairments that lead to a finding of disability for children. In this judicial review, Haste argues that the ALJ failed to assess evidence tending to show that PMB did in fact meet a listing. As explained

---

[1]Michael J. Astrue took office as Commissioner of the Social Security Administration while this case was pending before the court. Commissioner Astrue is substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

below, the ALJ failed to address adequately substantial evidence contrary to his conclusion that PMB was not disabled.  The case must be remanded for further consideration.

*Background*

PMB was born in 1991.  PMB's mother filed an application on behalf of PMB on January 23, 2004, when she was twelve years old.  According to the application, PMB was rendered disabled on September 14, 2002, when she was struck by two police motorcycles.  R. 78.  According to the hospital discharge report, one police motorcycle struck PMB and a second police motorcycle proceeded to run over her abdomen.  R. 84.  PMB sustained multiple fractures of the pelvis, spine, clavicle, and right orbital bone.  R. 83.  The incident also left PMB with a lacerated spleen and a closed head injury.  R. 84.  CT scans of PMB's head showed right frontal small punctuate hemorrhages.  R. 90.  A small amount of interhemispheric blood was observed, along with a skull fracture.  R. 90-91.  She was hospitalized for twelve days.  R. 84.

I.    *Post-Incident Medical Evidence*

During the initial follow-up examination at the Indianapolis Neurosurgical Group, Dr. Michael Turner reported in October 2002 that he was "quite pleased with her progress" since the accident.  R. 79.  Since that follow-up exam, however, Ms. Haste noticed certain personality changes relative to PMB's pre-accident

condition.  Ms. Haste observed that her daughter had "somewhat of a flat affect and seem[ed] much more withdrawn."  R. 78.  PMB's performance in school had also fallen off, as she went from a B student to receiving C's. During the next follow-up examination in January 2003, Dr. Turner noted Ms. Haste's concerns but did not observe any apparent problems during his basic exam.  *Id.*  He reported that PMB was "bright, awake and alert."  *Id.*  PMB had full extraocular motion, her pupils reacted briskly, her face moved symmetrically, and she had normal strength in her extremities.  Cognitively, PMB was "bright and interactive." *Id.*

Dr. Mary VanHoy, PMB's eye doctor, noted during an October 2003 visit that PMB continued to report problems stemming from the motorcycle incident. She complained of headaches and mood swings, as well as a burning sensation and redness in her eyes.  R. 113.  Dr. VanHoy was able to confirm clinical signs of post-trauma syndrome with an enlarged physiological blind spot and constricted color visual fields in the right eye.  *Id.*  The left eye remained normal. *Id.*  Dr. VanHoy believed that, with an extensive treatment program, PMB's prognosis for rehabilitation of her visual problems was "excellent."  R. 114.

In February 2004, PMB saw Dr. James Pappas of Capitol Neurology.  PMB's mother told Dr. Pappas that since the motorcycle incident, PMB exhibited an altered personality, showed no remorse or satisfaction, often had staring spells, and had problems with short term memory.  R. 126.  PMB had developed

symptoms of social anxiety. She would become nervous around large numbers of people. *Id.* Paxil did not help her condition. PMB further complained of headaches that had decreased in frequency since the incident but still occurred twice a week on average. Dr. Pappas concluded after examining PMB that her sporadic headaches were consistent with common migraines. He recommended an EEG to evaluate the cause of her staring spells. In evaluating PMB's social anxiety symptoms, he found that she had "no clear neurovegetative signs of depression." R. 127. He suggested the use of Zoloft and noted: "It is not uncommon for children to have poor impulse control or even disinhibition following a head injury, particularly if there is a frontal lobe injury." *Id.*

PMB underwent two neuropsychological evaluations by neuropsychologist Bryan A. Hudson, Ph.D. After the March 2003 exam, Dr. Hudson concluded that PMB "demonstrated a number of very mild deficits that are consistent with right prefrontal lobe involvement." R. 153. PMB was "also experiencing mild mood difficulties characterized by increased apathy, withdrawal behavior, and increased concentration difficulties." *Id.* PMB also exhibited "mild problems with attention control, cognitive slowing, decreased abstraction ability, and disturbances in planning and organization." R. 154. While PMB had "mild memory impairments," Dr. Hudson opined that they were primarily due to poor attention control. *Id.* Dr. Hudson suspected that addressing PMB's mood issues would likely decrease her neuropsychological deficits to a subclinical level. *Id.* While "a much greater degree of external guidance" was suggested as far as organizing PMB's academic

efforts (such as monitoring a homework log), Dr. Hudson did not believe a change in curriculum would be necessary, nor did he believe PMB would need to be shifted to a special education environment.  R. 154-55.

After examining PMB again in March 2004, Dr. Hudson opined that her test scores "suggest that she maintains the ability to function at age and grade appropriate levels."  R. 144.  Nevertheless, he found that PMB also had "a number of specific neuropsychological weaknesses that are consistent with right prefrontal lobe involvement."  *Id.*  These weaknesses included, for example, mild disturbances relating to cognitive flexibility, fluid problem solving, and attention control in light of non-verbal stimuli.  PMB continued to show signs of decreased affective responsiveness, which would affect her interpersonal and social functioning.

II.    *Evidence from Teachers*

To aid in the disability determination, two of PMB's teachers in middle school jointly completed a teacher questionnaire issued by the Social Security Administration in March 2004.  R. 133-40.  The teachers had extensive contact with PMB.  During the prior seven months, they had worked with her for more than two hours every school day.  R. 133.  They noted that PMB was absent from school at least one to two days a week.  They stated that PMB had "very serious problems" with acquiring and using information,  R. 134, "obvious problems" with attending and completing tasks, R. 135, "obvious problems" moving about and

manipulating objects, R. 137, "no problems" with interacting and relating to others, R. 136, and "no problems" caring for herself. R. 138.

PMB's counselor at the middle school completed a "Childhood Educator Questionnaire" in March 2004. R. 141. The counselor reported that PMB was in the sixth grade but was functioning below her grade level. She had failed math, and her abilities were declining. While PMB was still classified as a regular education student, she was receiving extra help from teachers and a modified (reduced) workload. The counselor commented that PMB's "short term memory is very weak, so learning concepts [is] difficult. Her ability to comprehend & process is not efficient." R. 141. As far as PMB's physical capabilities, the counselor reported that PMB had participated in gym class but that her gross motor skills were "not good." *Id.*

In April 2004, two teachers submitted mandatory assessments of PMB for inclusion in her school file. One teacher found PMB to be average in most respects (such as attitude, class participation, completion of assignments). R. 158. The same teacher noted, however, that PMB was below average in attendance, exhibited "no short term memory" compared to classmates, did not seem very focused, and was not self-motivated. *Id.* The other teacher (who had also contributed to the March 2004 report) found that PMB was "below average" as far as completing in-class assignments, completing homework, test scores, and study habits. R. 159. PMB's attendance was "unsatisfactory." *Id.* Compared to

classmates, PMB was "very below" in skills, with "no short term memory." *Id.* The same teacher had accommodated PMB's limitations by giving reduced homework assignments and fewer test questions. *Id.* The school psychologist noted that because of PMB's issues with short-term memory, she would "have to over learn much material." R. 183.

III.   *Examination by State Medical Experts*

In June 2004, PMB saw clinical psychologist Howard Wooden, Ph.D. R. 186-88. Dr. Wooden observed that PMB remained capable of feeding, dressing, and bathing herself. Her language skills were generally good, aside from a general passivity or lack of spontaneity. He noted no issues with motor skills. Dr. Wooden noted that PMB no longer had any friends and engaged in essentially no social activities at the time. In carrying out chores, Dr. Wooden noted, PMB evidently was having difficulty completing sequential activities. Dr. Wooden concluded that PMB did not exhibit signs of any severe cognitive defects. He did note, however, that PMB showed "extreme" emotional blunting, which could possibly be related to a frontal lobe injury. R. 188.

In June, August, and September 2004, four state medical consultants reviewed PMB's file and rendered their opinions on her ability to function. Drs. Roush and Neville opined in June 2004 that PMB had "less than marked" limitations in "acquiring and using information," "interacting and relating to others," and "attending and completing tasks." R. 193. Drs. Gaddy and Klion

found in August and September 2004 that PMB had no limitations as to moving around and manipulating objects, as well as in the area of health and physical well-being. R. 198. They found "less than marked" limitations in the areas of "acquiring and using information," as well as "interacting and relating with others." R. 197. They did not express an opinion on PMB's ability to attend to and complete tasks. Drs. Gaddy and Klion did comment that PMB was having "some problems with on-task behavior." *Id.*

IV.   *Testimony at the Hearing*

In June 2005, PMB appeared with her mother and grandmother before ALJ Jay E. Levine. PMB testified that she was having some trouble in school, received one-on-one help, and was enrolled in a special education class. R. 220. She was not involved in any extracurricular activities but stated that she had "a lot of friends." *Id.* She testified that she was generally happy. R. 221. When asked whether she still had any lingering physical problems from the accident, PMB stated that she still had pain in her clavicle. *Id.*

The ALJ asked PMB's grandmother about whether PMB had any problems in daily functioning. She responded that PMB "has her good days and her bad days." R. 224. She said that on occasion, PMB "just doesn't understand what you're saying or hear what you're saying sometimes." *Id.* PMB's grandmother testified that, after  the motorcycle accident, PMB had failed to learn or

-8-

accomplish anything in school because her attention would wander.  R. 224-25.

One-on-one help seemed to improve the situation.  R. 226.

PMB's mother testified that PMB was having serious difficulties learning in school because "she would forget within like 30 to 60 seconds after explaining it to her."  R. 230.  Ms. Haste also stated that PMB required a number of accommodations at school, including special classes, alternate grading, as well as shorter homework assignments and tests.  At home, PMB had difficulty completing chores because of forgetfulness.  In multi-step tasks such as a morning hygienic routine, PMB had trouble grasping the individual steps of the routine.  R. 232.

*Statutory Framework for Determining Disability*

To be eligible for supplemental security income under Title XVI of the Social Security Act, a child must establish that she suffered from a "physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).  The implementing regulations for the Act provide the three-step sequential evaluation of a disability claim.  See 20 C.F.R. § 416.924 (b)-(d).  The steps are:

(1)    Is the child engaged in substantial gainful activity?  If so, she is not disabled.

(2)     If not, does the child have a medically severe impairment or combination of impairments?  If not, then she is not disabled.

(3)     If so, does the child's impairment meet, medically equal, or functionally equal an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. § 404?  If so, the child is disabled.

When applying this test, the burden of proof rests on the claimant at each step. See *Oliver v. Barnhart*, 2006 WL 3207864, at *7 (S.D. Ind. Sept. 15, 2006) (Tinder, J.).

PMB argues that she demonstrated that her mental impairments functionally equaled a listing.  To determine whether an impairment is functionally equivalent to a listing, the ALJ must analyze its severity in six functional areas or "domains." 20 C.F.R. § 416.926a.  These domains are of: (a) acquiring and using information, (b) attending and completing tasks, (c) interacting and relating with others, (d) moving about and manipulating objects, (e) caring for oneself, and (f) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  To meet the listing, the claimant must show that she has an "extreme" limitation in one domain or "marked" limitations in two domains. 20 C.F.R. § 416.926a(a).  A limitation is "extreme" if it interferes very seriously with the claimant's ability to initiate, sustain, or complete activities independently. 20 C.F.R. § 416.926a(e)(3)(I).  A limitation is "marked" if it interferes seriously with the claimant's ability to initiate, sustain or complete activities independently, or is a limitation that is "more than moderate" but "less than extreme."  20 C.F.R. § 416.926a(e)(2)(I).

*Standard of Review*

If the Commissioner's decision is supported by substantial evidence, it must be upheld by a reviewing court. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To determine whether substantial evidence exists, the court reviews the record as a whole but does not attempt to substitute its judgment for the ALJ's judgment by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses. *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits," the court must defer to the Commissioner's resolution of that conflict. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

A reversal and remand may be required, however, if the ALJ committed an error of law, *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1997), or if the ALJ based the decision on serious factual mistakes or omissions, *Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996). The ALJ has a basic obligation to develop a full and fair record, *Nelson*, 131 F.3d at 1235, and must build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings, *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003). If the evidence on which the ALJ relied does not support the conclusion, the decision cannot be upheld. *Id.*

*The ALJ's Disability Determination*

Applying the three-step process, the ALJ found that PMB satisfied the first and second steps.  PMB had no work history and suffered from a number of "severe" physical and mental impairments when taken alone or in combination. These impairments consisted of a right parietal skull fracture, orbital fracture, spleen injury, left clavicle fracture, rib fractures, lumbar spine fractures, right sacral ala fracture, and "deficiencies in neural psychological functioning including problems with short-term memory, a short attention span, episodes of blank stares, an erratic mood and social anxiety."  R. 12.  At the third step, the ALJ found that these impairments did not meet or equal any listed impairment.  The ALJ concluded that PMB's impairments did not functionally equal a listed impairment.  He found that she had a marked limitation in only one domain, that of interacting and relating to others.  R. 13.[2]

Because the ALJ found that PMB did not have an extreme limitation in any single domain or a marked limitation in two or more domains, he concluded that PMB was not disabled for purposes of the Social Security Act.  The Appeals

---

[2]Ms. Haste claims that the ALJ erred by failing to cite Listing 112.04, the listing for mood disorders, despite medical evidence from the state consulting psychologist that PMB suffered from extreme emotional blunting.  Listing 112.04 requires a finding that the claimant had a marked impairment in two of the following: cognitive/communicative functioning, age-appropriate social functioning, age-appropriate personal functioning, and difficulties maintaining concentration, persistence, and pace. See 20 C.F.R. § 404, Subpt. P, App. 1, § 112.04(B).  The ALJ did not find that PMB fulfilled this condition, but on remand, the ALJ may revisit this determination.

Council denied Ms. Haste's request for review, leaving the ALJ's decision as the final decision of the Commissioner of Social Security.  See *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000).  Ms. Haste asks this court to review the denial of PMB's application.  The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

*Discussion*

I.    *Evaluation of Evidence Relating to Applicable Domains*

Ms. Haste first contends that the ALJ ignored substantial evidence that demonstrated that she had marked or extreme limitations in several areas.  The ALJ need not provide "a complete written evaluation of every piece of testimony and evidence," *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir. 1995), but there are limits to this generally deferential approach.  The ALJ need not cite every piece of evidence, but he cannot address only evidence favorable to his conclusion.  He "must articulate at some minimum level his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position." *Burnett v. Bowen*, 830 F.2d 731, 735 (7th Cir. 1987) (quoting *Orlando v. Heckler*, 776 F.2d 209, 213 (7th Cir. 1985)); see also *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992) ("the ALJ must minimally articulate his reasons for crediting or rejecting evidence of disability").

In denying benefits, the ALJ concluded that PMB had marked limitations in only one domain, that of interacting and relating with others.  According to Ms.

-13-

Haste, the ALJ ignored substantial evidence that she had marked limitations in at least two more domains, acquiring and using information and attending and completing tasks.

A.   *Acquiring and Using Information*

When evaluating whether claimants are limited in this domain, ALJs are concerned with "how well you acquire or learn information, and how well you use the information you have learned."  20 C.F.R. § 416.926a(g).  The record contains evidence that PMB was seriously limited in this regard.  In March 2004, PMB's teachers completed questionnaires that support her disability claim.  These questionnaires are issued by the disability determination bureau and ask a claimant's teachers to evaluate in detail the claimant's capabilities in the domains relevant to a disability determination.  Here, two teachers stated explicitly that PMB was having "serious trouble" in the domain of acquiring and using information.  These teachers observed that PMB had "very serious problems" providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions.  R. 134.  They also observed that PMB had "serious problems" reading and comprehending written material and comprehending and doing math problems.  *Id.*

Additional teacher reports are consistent with these questionnaire responses.  In a separate teacher report, one teacher observed that PMB was "very

-14-

below her classmates in skills, no short term memory." R. 159.  Another teacher

noted that PMB exhibited "no short term memory." R. 158.  As a consequence of

PMB's condition, she received fewer homework assignments and reduced test

questions.  R. 159.  Compared to other children, she rated "below average" in:

completion of in-class assignments, completion of homework, test scores, and

study habits.  *Id.*

Teachers  and  parents  who  observe  a  child's  behavior  may  provide

substantial  evidence  of  a  mental  disorder  or  the  lack  thereof.    20 C.F.R.

§ 416.913(d); see also *Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004).

PMB's teachers had an opportunity to work closely with her on a near-daily level

for seven months before forming their opinions.  Based on this close contact, at

least three teachers provided evidence that supported a finding of a limitation in

the area of acquiring and using information.  In fact, the ALJ himself indicated

that the reports from PMB's teachers were significant, as he cited them to support

his finding that PMB was generally functioning well:

> Additional teachers' reports indicate that the claimant is performing well
> and without significant difficulties.  The claimant is in a general education
> environment 90 percent of the day and receives 50 minutes of resource
> assistance.  Her teachers have reported that she was working close to
> capacity and not in danger of failing, that the claimant's mood was great
> and there was no evidence of any attention or behavioral problems.

R. 13.  But the teachers' reports were not as positive as the ALJ portrayed in his

opinion.  At no point did the ALJ mention this contrary evidence, much less

explain why he rejected this evidence in determining that PMB suffered less than

a marked limitation in the area of acquiring and using information.  Because the ALJ's opinion is silent about this substantial evidence, it is impossible for the court to trace the ALJ's reasoning while having confidence that all relevant evidence was considered.  The ALJ's failure to mention this evidence therefore casts serious doubt on the ultimate finding of no disability.

     B.    *Attending and Completing Tasks*

To determine whether a claimant is limited in the domain of attending and completing tasks, the ALJ must "consider how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them."  20 C.F.R. § 416.926a(h).  According to Ms. Haste, the ALJ ignored evidence tending to show that PMB had marked limitations in her ability to carry out activities.  At the administrative hearing, Ms. Haste testified that her daughter was having difficulties completing assigned chores:

> I just can't tell her to clean her bedroom.  I have to specifically sit down and write everything she needs to do in her bedroom, and I have to watch her do it because she does not understand.  Same as going and taking a shower, what she needs to wash.  She forgets those things.  I have to be on her all the time to show her what she needs to do when it comes to stuff like that.

R. 231-32.  Her mother further testified that PMB's mental condition caused her to have difficulty completing other simple tasks without help:

> I have to – we – I write down every day what she has to do.  Get up, brush her teeth, where she has to wash, what she has to do, because she does not – I can't just tell her to go take a shower.  She doesn't know how to break it down sequence in steps.  You know, that you go in there and wash your face, and you know . . . .

R. 232.  This testimony was not inconsistent with the ambiguous findings of state consulting physicians Drs. Gaddy and Klion, who noted in their report that PMB had "some problems with on-task behavior," but who did not specify whether these problems left her with any particular degree of limitation in this domain. R. 197.

The ALJ apparently credited the testimony of Ms. Haste to the extent that it showed that PMB had marked limitations in the domain of interacting and relating with others.  R. 13 (finding that testimony of PMB's mother "consistent with the claimant's absence of emotion on all occasions").  The ALJ did not mention testimony relevant to whether PMB could attend to and complete tasks. Even if the court were to assume that the ALJ implicitly rejected the credibility of this testimony, he did not perform the "necessary explicit credibility determination" of PMB's mother.  See *Barnes v. Massanari*, 171 F. Supp. 2d 780, 789 (N.D. Ill. 2001).

Some evidence in the record indicates that while PMB had problems in this domain, her limitations did not rise to the level of "marked" or "extreme."  For example, PMB's teachers found that she had an "obvious problem" with certain aspects of attending and completing tasks, but they were not willing to

characterize her limitations as "serious."  R. 135.  State consulting physicians Neville and Roush also reviewed the record and concluded that PMB's limitations in this regard were "less than marked."  R. 193.  It may be that the testimony of PMB's mother – even if accepted – is insufficient to establish that PMB's limitations were marked or extreme.  Or the ALJ could conclude that her claims lacked credibility in light of the evidence as a whole.  In this case, however, the ALJ's opinion does not indicate how he handled this evidence.  On remand, this testimony also needs another look.

II.    *Medical Expert Opinion Regarding PMB's Limitations*

PMB finally argues that on remand, the ALJ should obtain an updated opinion from a medical expert.  Four state medical experts reviewed the record and concluded that in each domain, PMB was either not limited or had limitations that were "less than marked."  R. 191-98.  In arguing for a new medical evaluation, PMB speculates that the four state experts did not have the benefit of the teacher questionnaires when formulating their opinions.  See SSR 96-6p (stating that an ALJ should obtain an updated medical opinion when additional medical evidence is received that could modify the previous finding of the state medical consultant).  PMB offers no evidence that establishes that the reviewing experts did not have the benefit of the documents in question.  The medical reviews were conducted in June, August and September 2004.  R. 191-198.  The teacher questionnaires at issue were completed in March 2004, several months before the reviews took place.  Nor has PMB offered any additional evidence

beyond that already in the record to support her claim of disability.  Because there is no basis for concluding that new evidence has arisen that would alter the opinions of the state medical experts in this case, there is no need for an additional medical review on remand, but nothing in this decision should be deemed to prevent such additional review, which may be helpful in light of the passage of time.

*Conclusion*

The decision of the ALJ is reversed and remanded for reconsideration consistent with this entry.  Final judgment shall be entered consistent with this entry.

So ordered.

Date: September 21, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov